IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD KAPER, on behalf of himself and all others similarly situated,** | : | CIVIL ACTION NO. 1:24-CV-164 |
| | : | |
| | : | (Judge Conner) |
| **Plaintiff** | : | |
| | : | |
| v. | : | |
| | : | |
| **PENNSYLVANIA GAME COMMISSION,** | : | |
| | : | |
| **Defendant** | : | |

### MEMORANDUM

Plaintiff Richard Kaper advances claims against defendant the Pennsylvania Game Commission for disability discrimination under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*  Kaper alleges the Commission violated his rights under those laws by failing to provide meaningful access to state game lands and the hunting opportunities those lands offer.  The Commission moves to dismiss Kaper's claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  We will deny the motion.

**I.  Factual Background & Procedural History**

Kaper is a 71-year-old resident of Renfrew, Pennsylvania, who suffers from "spinal stenosis, which is a narrowing of the spinal column as a result of arthritis." (See Doc. 10 ¶¶ 11-12).  Due to his medical condition, Kaper experiences difficulty walking and other mobility issues.  (See id. ¶ 13).

The Commission "purchases, manages and maintains" state game lands to provide recreational sport-hunting opportunities to the public. (See id. ¶ 29). There are over 1.5 million acres of state game lands across the Commonwealth, split into six regions (southwest, southcentral, southeast, northwest, northcentral, and northeast).[1] (See id. ¶ 30). According to Kaper, the game lands provide access to two sporting programs; each requires a distinct permit or tag issued by the Commission. (See id. ¶¶ 31-39). "The first program is the general ability to hunt and trap wildlife" in all six regions, which members of the public access by obtaining a hunting license. (See id. ¶¶ 31-34). The second, more exclusive program is the ability to hunt and trap elk within designated zones of the elk management area, located within the northcentral region of the state game lands. (See id. ¶¶ 37-38). Individuals must possess an elk-specific permit or "tag" to hunt elk. (See id. ¶ 39). The Commission issues those tags in an annual randomized lottery; however, the number of lottery applicants greatly exceeds the limited supply of elk tags issued annually. (See id. ¶¶ 40-42). For example, the Commission issued just 178 elk tags for the 2022-2023 season in a lottery of over 100,000 applicants. (See id. ¶ 42).

The Commission "promote[s] public access . . . for persons with mobility disabilities" by creating and maintaining "designated routes" throughout the state game lands. (See id. ¶¶ 47-48 (citations omitted)). The designated routes allegedly

---

[1] The six regions comprise 314 separately numbered state game lands. (See id. ¶ 65).

2

are the only means for disabled individuals to access the state game lands. (See id. ¶ 51). They are also only available to those with disabled access permits. (See id. ¶ 52 (citation omitted)). Kaper had two such permits. He was permitted to use certain types of vehicles as hunting blinds,[2] (see id. ¶¶ 53, 55), and to access the designated routes using mobility devices and motor vehicles, (see id. ¶¶ 59-60 (citation omitted)). Kaper owns a Mahindra 750 utility task or terrain vehicle ("UTV") and he claims it is covered by both permits. (See id. ¶¶ 55-56).

In addition to the disability-specific permits, Kaper possessed a general-purpose hunting license at all relevant times. (See id. ¶¶ 34-36). After entering the elk tag lottery for over 20 years, Kaper finally won an elk tag, allowing him to hunt female elk ("cow") in elk zone 13 during the 2022-2023 season. (See id. ¶¶ 38, 45). On December 31, 2022, Kaper set out for an eight-day hunting trip to elk zone 13. (See id. ¶ 81). Nine other individuals who are not disabled joined him. (See id. ¶ 109). During the trip, Kaper attempted to access state game land 100—which consists of over 21,000 acres within elk zone 13—using three designated routes provided by the Commission. (See id. ¶¶ 81, 85). According to Kaper, the routes were geographically clustered in the northeast quadrant of game land 100 and were not subject to any posted restrictions. (See id. ¶¶ 86-87).

---

[2] Under Pennsylvania law, a "blind" is "[a] manmade structure of any size, shape or design constructed or arranged of any material in such a manner as to conceal the body of any person, either in whole or part." See 34 PA. CONS. STAT. § 102.

Kaper alleges the three routes were not accessible to him. The first was too narrow to accommodate his UTV. (See id. ¶ 88). He fell twice while attempting to walk into the first trail. (See id. ¶¶ 89-90). He then discovered the access gates to the two other trails were locked, but ultimately gained access by driving around the gates. (See id. ¶ 93). He could only proceed for a short distance because the trails were too narrow for his vehicle and a fallen tree blocked the path. (See id. ¶ 93).[3] At some point during his trip, Kaper spoke about his experience with a local land manager who informed him that "additional locked gates likely could have been opened for him." (See id. ¶ 100). Kaper alleges the nine non-disabled travelers had access to far more game lands than he did. (See id. ¶ 109). He asserts that he spent more than $3,000 on travel, lodging, a guide, the elk tag, and other expenditures for the trip. (See id. ¶¶ 82-83).

Apart from his individual experience, Kaper also advances more general allegations regarding accessibility of the state game lands. (See, e.g., id. ¶¶ 69-72, 99). He contends, for example, that just 24% of the 314 game lands have designated disabled-access routes. (See id. ¶ 99). He alleges the existing routes are either too narrow for mobility devices by design, (see id. ¶ 70), or are inaccessible due to detritus, including fallen trees and other blockages, (see id. ¶ 71). He also cites comments supposedly made by a Game Commissioner during a September 2017 Commission meeting concerning amendments to the regulatory framework

---

[3] It is unclear from the amended complaint whether the fallen-tree allegation applies to the second designated route, the third, or both.

4

governing disabled access to state game lands. The (unnamed) Commissioner allegedly stated that ADA "lawsuits are history" thanks to the new regulations, (see id. ¶¶ 75-76), and he "expect[ed] to see more" large four-wheel vehicles on state game lands as a result, (see id. ¶¶ 78-79). Kaper avers the Commission, despite these comments, did not take any further action to maintain the accessible routes after amending the regulations. (See id. ¶¶ 76, 78-79).

Kaper brings two claims on behalf of himself and a putative class, which he defines as "all Pennsylvania residents who have a mobility disability and have attempted to or will attempt to access the State Game Lands." (See id. ¶¶ 117-118). First, he asserts that the Commission violates Title II of the ADA (Count I) by failing to provide meaningful access to the state game lands. (See id. ¶¶ 129-140). He specifically alleges that there are too few designated routes, and those in existence are poorly maintained, too narrow, or both, rendering them inaccessible. (See id. ¶¶ 135-137). Kaper also brings a claim under Section 504 of the Rehabilitation Act (Count II) based on the same alleged facts. (See id. ¶¶ 141-147). He seeks compensatory damages, declaratory relief, attorney's fees, expenses, and costs, as well as an injunction compelling the Commission to: (1) prepare a Self-Evaluation Plan and Transition Plan; (2) remediate, clear, and repair all existing disabled access routes; (3) construct new compliant disabled access routes; (4) adopt and implement methods, policies, and practices to gain and maintain compliance with federal accessibility standards; (5) continually ensure a sufficient number of disabled access routes exist; and (6) issue replacement elk tags for himself and the

putative class members who won the elk tag lottery, but were unable to access state game lands. (See id. at 19-20 ¶¶ C-H).

The Commission moves to dismiss the amended complaint pursuant to Rule 12(b)(6). The motion is fully briefed and ripe for disposition.

## II. Legal Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. See FED. R. CIV. P. 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint, we conduct a three-step inquiry. See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded. Id. at 131-32; see Fowler v. UPMC Shadyside, 578

F.3d 203, 210-11 (3d Cir. 2009). Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556. A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

## III. Discussion

The Commission advances three arguments in support of its motion. First, it asserts that Kaper fails to plausibly allege the state game lands program, when viewed in its entirety, is not readily accessible to and usable by persons with disabilities. (See Doc. 17 at 5-12). Second, it argues Kaper has not pleaded entitlement to compensatory damages. (See id. at 12-18). Lastly, it contends we should dismiss Kaper's request for a replacement elk tag because it will not remedy his alleged injury. (See id. at 18-19). We address each argument *seriatim*.

### A. Discrimination Claims

Courts within our circuit review discrimination claims under Title II of the ADA and Section 504 of the Rehabilitation Act "together because 'the substantive standards for determining liability are the same.'" Furgess v. Pa. Dep't of Corr., 933 F.3d 285, 288 (3d Cir. 2019) (quoting McDonald v. Pa. Dep't of Pub. Welfare, 62 F.3d 92, 95 (3d Cir. 1995)). Title II forbids public entities from discriminating against disabled individuals by excluding them from participating in, or denying them the benefits of, certain services, programs, or activities. See 42 U.S.C. § 12132. To plead a *prima facie* case, Kaper must plausibly allege that: (1) he has a qualifying

disability; (2) he was denied the benefits of a program, service, or activity or was otherwise subjected to discrimination; and (3) the discrimination was on account of his disability.  Furgess, 933 F.3d at 288-89 (citing Chambers *ex rel.* Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 189 (3d Cir. 2013)).

The Attorney General is charged with promulgating regulations to enforce Title II and define programmatic accessibility.  See 42 U.S.C. § 12134(a).  The Department of Justice has issued regulations pursuant to that authority, which prohibit public entities from using "facilities . . . inaccessible to or unusable by individuals with disabilities."  See 28 C.F.R. § 35.149.  The regulations define accessibility by distinguishing between existing facilities, *i.e.*, those constructed prior to January 26, 1992, and newly constructed or altered facilities.[4]  A more lenient standard applies to existing facilities because Congress "does not generally mandate that existing . . . facilities be made accessible."  Disabled in Action of Pa. v. SEPTA, 635 F.3d 87, 92 (3d Cir. 2011).  Those regulations dictate that "a public entity shall operate each service, program, or activity so that the service, program, or activity, *when viewed in its entirety*, is readily accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.150(a) (emphasis added).  Programmatic access, not facility access, is the focus, and the regulations offer several ways to achieve programmatic compliance even if some existing facilities are inaccessible.  A public entity may deliver the services at alternative, accessible

---

[4] Buildings constructed or altered after January 26, 1992, are themselves subject to different standards of review depending on when work commenced.  See 28 C.F.R. § 35.151(c)(1)-(3).

sites, for example, or they may employ "any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.150(b)(1).

The regulations treat newly constructed and altered facilities differently. They require "each part of" a newly constructed or altered facility to be "readily accessible."  See 28 C.F.R. § 35.151(a)(1), (b)(1).  Their focus is on facility access, rather than programmatic access.  A stricter standard therefore applies.

The Commission argues we must view the hunting program[5] in its entirety when evaluating accessibility—an argument that presumes the stricter standard for existing facilities applies because the complaint does not state when the disabled access routes were built or last altered.  (See Doc. 17 at 5-12).  Kaper rejoins that the program need not be considered holistically for these purposes.  (See Doc. 18 at 8-10).  He emphasizes the early stage of this litigation; he is operating in an information void and cannot reasonably know the relevant dates without the benefit of discovery.  (See id. at 8-10 & n.1).  We agree with Kaper.

---

[5] As we will discuss, see *infra* pp. 15-19, the parties dispute the scope and characterization of the program(s) at issue.  To Kaper, the game lands provide access to two distinct programs: (1) "the general ability to hunt and trap wildlife," (see Doc. 10 ¶ 32); and (2) "the specific ability to hunt and trap elk," (see id. ¶ 37). The Commission asks us to dismiss all claims regarding the proposed stand-alone elk program.  (See Doc. 17 at 6-7).  We will address this argument below because the parties agree on the scope of the first proposed program—the ability to hunt wildlife on state game lands generally—and because the propriety of an additional elk-specific program relates to Kaper's request for a replacement elk tag, a request the Commission urges us to dismiss.

Though our court of appeals has not squarely addressed the issue, other courts have denied motions to dismiss programmatic access claims when the pleading of record omits the dates facilities were constructed or last altered. See, e.g., Twede v. Univ. of Wash., 309 F. Supp. 3d 886, 904-05 (W.D. Wash. 2018) (collecting cases).[6] In Twede, plaintiffs alleged the parking lots at the defendant university violated Title II. See id. at 891. The university moved to dismiss under Rule 12(b)(6) because the pleadings did not contain the date any of the parking facilities were constructed or last altered. See id. at 905. The court denied defendant's motion and allowed discovery to proceed. See id. "Plaintiffs," the court explained, "are at an informational disadvantage and likely will be able to provide evidentiary support for their claims . . . only after conducting discovery." See id. at 905. And allowing discovery is particularly appropriate when defendants have exclusive possession of the information required to plead with additional specificity. See id. (citing Hamblen v. Diamante Crossroads Plaza, LLC, No. 08-CV-0561, 2009 WL 825809, at *2 (D. Ariz. Mar. 30, 2009); Burrell v. Akinola, No. 3:15-CV-3568, 2016 WL 3523781, at *5 (N.D. Tex. June 27, 2016)).

We find these authorities persuasive. It would be premature to delve into factual questions required to determine the applicable legal standard in response to a Rule 12(b)(6) motion. Here, as in Twede, the information necessary to demonstrate when the designated trails were constructed or last altered is in the

---

[6] We acknowledge these authorities are not binding. Citations to nonbinding decisions reflect we have carefully considered and are persuaded by the decisions' *ratio decidendi*.

Commission's possession—a fact the Commission does not dispute. The Commission responds by arguing disabled persons can access the general hunting program by using non-designated trails with a manual or automatic wheelchair. (See Doc. 17 at 8). But the amended complaint's *allegata*—which we must accept as true—belie that assertion. Kaper alleges that the designated routes are inaccessible and that alternative means of access are deficient due to locked gates, inadequate design, debris, and other issues. (See Doc. 10 ¶¶ 51, 69-72). He claims that he fell twice when he attempted to traverse a designated route on foot, (see id. ¶ 90), and that a tree blocked all wheelchair and vehicle access to at least one other trail, rendering it unusable, (see id. ¶ 93). These allegations suffice to defeat the Commission's motion at this stage.

Moreover, the cases the Commission cites are inapposite. Kirola v. City and County of San Francisco, 860 F.3d 1164 (9th Cir. 2017), addressed an appeal taken from a motion for judgment as a matter of law following a five-week bench trial concerning access to public parks. The Kirola court rejected the plaintiffs' accessibility claims despite statistical evidence showing the overwhelming majority of curb ramps and intersections contained "major barriers to accessibility," because the parks were still accessible when viewed as a whole. See Kirola, 860 F.3d at 1184. Not only did Kirola involve factual determinations made after an extensive trial, it also applied the standard for accessibility of existing facilities. Yet here we lack sufficient factual information to determine the proper standard at this juncture. Kirola is not persuasive in this context.

11

The Commission's reliance on Creel v. Rowan University, No. 16-CV-2883, 2017 WL 2734709 (D.N.J. June 26, 2017), similarly misses the mark. There, plaintiff advanced ADA claims based upon allegations that the defendant's parking lots were inaccessible because they were not located on the safest and most direct route, and contained curb ramps that sloped more than five feet. Creel, 2017 WL 2734709, at *4. The court classified those allegations as conclusory and dismissed the complaint for lack of factual information regarding the specific routes and lots at issue and their alleged deficiencies. Id. at *4. Lacking "the actual contours of th[e] suit," the court dismissed the case with leave to amend. See id. Kaper's amended complaint, by contrast, specifically identifies three designated trails within state game land 100. (See Doc. 10 ¶¶ 85-89, 93). It also includes details of the conditions he confronted at the trails—narrow or locked entryways, overturned trees, and other blockages—all of which impeded access to the game lands. (See id.) Creel does not undermine our conclusion that Kaper has adequately pleaded a programmatic access claim.

**B.  Compensatory Damages**

The Commission next urges us to dismiss Kaper's request for compensatory damages. (See Doc. 17 at 12-18). To state a claim for compensatory damages, Kaper must "show intentional discrimination under a deliberate indifference standard." Durham v. Kelley, 82 F.4th 217, 225 (3d Cir. 2023) (citing Furgess, 933 F.3d at 289). He "must allege '(1) knowledge that a federally protected right is substantially likely to be violated . . . and (2) failure to act despite that knowledge.'" Id. at 226 (quoting Haberle v. Troxell, 885 F.3d 170, 181 (3d Cir. 2018)) (alteration in original). The claimant need not prove the defendant personally harbored "ill will

12

or animosity toward the disabled" individual; the standard simply requires "a deliberate choice, rather than negligence or bureaucratic inaction." S.H. *ex rel.* Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 263 (3d Cir. 2013) (internal citations and quotation marks omitted).  In other words, "[d]eliberate indifference requires *actual knowledge*; allegations that one would have or 'should have known' will not satisfy the knowledge prong of deliberate indifference." Id. at 266 n.26 (citing Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012), abrogated on other grounds as recognized in Mack v. Yost, 968 F.3d 311, 319 n.7 (3d Cir. 2020)) (emphasis in original).  A plaintiff who alleges an entity's policies and procedures resulted in a substantial likelihood of harm can satisfy its burden by alleging facts that suggest either "existing policies caused a failure to adequately respond to a pattern of past occurrences of injuries like" those suffered by the plaintiff, or that "the risk of cognizable harm was so great and so obvious that the risk and the failure . . . to respond will alone support finding deliberate indifference." Haberle, 885 F.3d at 181 (quoting Beers-Capitol v. Whetzel, 256 F.3d 120, 136-37 (3d Cir. 2001)) (alteration in original) (internal quotation marks omitted).

      The facts in Kaper's amended complaint, taken together and with all reasonable inferences in his favor, plausibly allege deliberate indifference.  As a preliminary matter, Kaper's interaction with the land manager is insufficient in and of itself.  The manager's comment that the policy needs to be "reassessed" only suggests that the Commission knew it could have done better, which does not demonstrate deliberate indifference.  See S.H., 729 F.3d at 266 n.6.  One employee's failure to respond to an anecdotal complaint is closer to "negligence or bureaucratic

inaction" than it is "a deliberate choice," and only the latter entitles a plaintiff to compensatory damages.  See id. at 263.

Kaper's other factual allegations are enough to plausibly establish a significant and obvious risk of harm resulting from the Commission's policies and procedures.  For example, Kaper asserts that, in 2017, the Commission adopted revised regulations intending to improve ADA compliance and avoid related lawsuits—and then did nothing to comply with its own directives.  (See Doc. 10 ¶¶ 75-76).  As a result, the designated routes allegedly have "fallen into disrepair" and cannot accommodate disabled hunters or their mobility devices.  (See id. ¶¶ 70-71, 76).  Kaper also alleges the Commission does not provide maps of the designated routes, or updates regarding which trails are open or accessible at any particular time.  (See id. ¶ 72).  At this procedural juncture, a claim that a public entity allegedly adopted regulations with the goal of achieving or improving ADA compliance and then did nothing to maintain the resources provided by those regulations is sufficient to demonstrate deliberate indifference.  Discovery may reveal circumstances demonstrating entitlement to compensatory damages based on obvious risk.  Kaper's claim for compensatory damages stands.[7]

---

[7] The Commission's other arguments on this point are unconvincing.  It argues, first, that the temporal gap between the 2017 adoption of updated regulations and Kaper's experience in 2022 is too great to plausibly demonstrate deliberate indifference.  (See Doc. 17 at 16).  We reject this argument because the amended complaint alleges the Commission recognized its updated regulations would increase ADA compliance.  (See Doc. 10 ¶¶ 74-76).  The Commission's obligation to comply with the ADA did not change over time, and thus a choice to abandon its program would result in an obvious likelihood of harm.  In any event, that argument speaks to the weight of evidence, a forbidden consideration on a motion to dismiss.  See Phillips, 515 F.3d at 233 (quoting Pinker, 292 F.3d at 374

### C. Replacement Elk Tag

The Commission argues we should dismiss Kaper's request for a replacement elk tag because there is no elk-specific program. (See Doc. 17 at 6-7, 18-19). From Kaper's perspective, a replacement elk tag would remedy barriers to accessing an adequately pleaded elk-specific program. (See Doc. 18 at 17-19).

Accurate characterization of a service, program, or activity is critical to the Title II analysis. Unfortunately, the regulations do not provide objective criteria for determining programmatic scope, and there is little caselaw interpreting the regulations in this context. See G.P. v. Claypool, 466 F. Supp. 3d 875, 887-88 (N.D. Ill. 2020) (citing, *inter alia*, Daubert v. Lindsay Unified Sch. Dist., 760 F.3d 982, 987 (9th Cir. 2014)), reconsideration granted in part on other grounds in G.P. v. Chi. Bd. of Educ., No. 17-CV-1891, 2021 WL 681120 (N.D. Ill. Feb. 22, 2021). In our circuit, "[t]he phrase service, program, or activity under Title II is extremely broad in scope and includes anything a public entity does." Geness v. Admin. Off. of Pa. Cts., 974 F.3d 263, 275 (3d Cir. 2020) (quoting Furgess, 933 F.3d at 289 (cleaned up)). For example, our court of appeals has characterized the judicial process used to determine whether a mentally ill person may be forcibly medicated as a service, program, or activity. See Disability Rts. N.J., Inc. v. Comm'r, N.J. Dep't of Hum.

---

n.7). Next, the Commission submits that the Commissioner's comments were made in the context of adopting regulations that expanded access to the hunting program and thus cannot plausibly demonstrate deliberate indifference. But that is immaterial. The ADA is not satisfied by a comprehensive regulatory scheme; rather, it focuses on access to public programs and facilities. See 42 U.S.C. § 12132; see also 28 C.F.R §§ 35.150-35.151. What matters is how the regulations are carried out in practice, not the content of the regulations themselves.

Servs., 796 F.3d 293, 303-04, 307 (3d Cir. 2015). The court also has recognized that providing inmates showers while incarcerated is a service, program, or activity. See Furgess, 933 F.3d at 291.

Here, the Commission argues the proposed elk-specific program is too narrow. In its view, to define the program too narrowly would end-run the safe-harbor, alternative compliance provisions of 28 C.F.R. § 35.150. It cites to G.P. v. Claypool for support. There, the plaintiff parent sued the Chicago Board of Education on behalf of her minor child, G.P. G.P., 466 F. Supp. 3d at 882. When G.P. was three years old, her family won a school-choice lottery and subsequently enrolled G.P. in the Drummond Montessori Magnet School. Id. at 882-83. The Board operated the school in the Drummond Building, which had been completed in 1893. Id. at 880. Three years after being enrolled at Drummond, G.P. began to experience Gaucher Disease, which prevented her from using the stairs as required to attend her classes and other activities. Id. at 882-83. G.P.'s parents then began to negotiate with (and litigate against) the Board regarding appropriate accommodations for their daughter's mobility issues. Id. at 883.

The Board eventually moved for summary judgment. Id. at 878. The parties disputed the programmatic definition, with G.P. taking the position that each individual school in the charter system was a distinct program, service, or activity.

16

Id. at 890. After summarizing Ninth Circuit caselaw on the subject,[8] the district court rejected G.P.'s proposed definition as too narrow. Id. at 890-91. Noting that "'perfect accessibility is not the applicable standard under 28 C.F.R. § 35.150,'" the court concluded that G.P.'s definition conflated facilities and programs, a mistake that would render Section 35.150(b)'s alternative accessibility provisions superfluous. Id. at 891 (quoting Kirola, 860 F.3d at 1184). The court rejected G.P.'s position because it "would make a hash" of the regulatory framework. Id. at 890. Instead, the court defined the program at issue as the Montessori school choice program in its entirety, found that G.P. had adequate access to alternative schools within the program, and granted the Board's motion. See id. at 891-92.

Here, the Commission argues characterizing the provision of land on which to hunt elk as a program distinct from the provision of land for hunting other wildlife would lead us down the dubious path the G.P. court avoided. (See Doc. 19 at 5-6). We disagree. The relationship between the elk program and the general hunting program is notably different than the relationship between Chicago's charter school system and each individual school within it. First, in G.P., students required physical access to a school to benefit from the charter-school system at all. To define each individual school as a program would thus conflate program access

---

[8] The Ninth Circuit applies a standard analogous to the one used in our circuit—one that defines a program as "a normal function of a government entity," which is "anything a public entity does." See Daubert, 760 F.3d at 987 (quoting Barden v. City of Sacramento, 292 F.3d 1073, 1076 (9th Cir. 2002) (internal quotation marks omitted)); see also Geness, 974 F.3d at 275 (articulating the Third Circuit's standard as "anything a public entity does" (quoting Furgess, 933 F.3d at 289)).

with facility access under the regulations. That is not the case here, insofar as the Commission offers a unique license to hunt wildlife generally and a different, very exclusive license for hunting elk. (See Doc. 10 ¶¶ 34, 39-40). Access to the elk-specific program is not necessary to benefit from the general hunting program. Further, like access to the charter-school program in G.P., access to elk tags is controlled by a lottery system. (See id. ¶ 39). The issuance of permits in a lottery does not prevent us from construing elk hunting on state game lands as its own program.

Lastly, although the designated trails connect hunters to both the general hunting and elk-specific programs, recognizing that the identified routes—*i.e.*, facilities—provide access to two distinct programs does not run the risk of conflating programs with facilities. This approach simply recognizes that while a public entity may use the same facilities to support access to multiple programs, each program must be accessible to disabled persons. Kaper has adequately pleaded the existence of an elk-specific program for present purposes, and, unlike the G.P. court, we do not yet have the benefit of fact discovery needed to assess the veracity of that allegation. The Commission is correct that, in federal court, "the nature of the violation determines the scope of the remedy." (See Doc. 17 at 18 (quoting Imprisoned Citizens Union v. Ridge, 169 F.3d 178, 188 (3d Cir. 1999)). But Kaper has plausibly alleged that he was denied the enjoyment of an elk-specific hunting program due to accessibility issues. A replacement elk tag, coupled with access reforms, logically would remedy the injury he allegedly suffered.

Accordingly, we will deny the Commission's motion to dismiss Kaper's request for a replacement elk tag.

### IV. Conclusion

We will deny the Commission's motion (Doc. 12) to dismiss the amended complaint for failure to state a claim. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     October 7, 2024